### FOR THE

## COUNTIES OF HAMPSHIRE AND FRANKLIN, AT NORTHAMPTON, SEPTEMBER TERM 1872.

PRESENT:

Hon. REUBEN A. CHAPMAN, Chief Justice.
Hon. JOHN WELLS,
Hon. JAMES D. COLT,
Hon. SETH AMES, } Justices.
Hon. MARCUS MORTON,

## HAMPSHIRE COUNTY.

## Florence Sewing Machine Company vs. Grover and Baker Sewing Machine Company & others.

A suit in a state court in which a citizen of the state is plaintiff and a citizen of the state and a citizen of another state are defendants cannot be removed, on the petition of the citizen of the other state, into a United States circuit court, under the U. S. St. of 1867, c. 196, as a whole suit; nor can it be so removed, as far as relates to the petitioning defendant, at least if the cause of action is not so divisible that the suit can proceed separately against each defendant in the different courts.

After a jury has announced that they have agreed upon a verdict, the judge may send them out again with further instructions before receiving the verdict.

Three owners of a patent licensed a manufacturer of machines to use it upon payment of a license fee for each machine to a receiver appointed by them. The receiver divided the fees equally, as soon as he received them, among the licensors. *Held*, that a suit brought by the licensees to recover the amount of fees paid by them, as paid under a mistake of fact, was properly brought against the licensors jointly, although no demand for repay

ment was made by the licensees before the amount received was distributed among the licensors.

The defendants licensed the plaintiffs to make machines involving a patent owned by the defendants at a patent rent of five dollars a machine, and agreed that no other license for such machines should be granted at a less patent rent per machine, without a corresponding reduction in the rent reserved under the license to the plaintiffs. Afterwards the defendants licensed A. B. to make such machines not exceeding 50,000, in consideration of $20,000. *Held,* that as long as the license to A. B. continued, the plaintiffs were bound to pay only a patent rent of forty cents on each machine manufactured by them, without regard to the number manufactured by A. B.

Upon an issue as to the meaning of "drop-feed sewing machines" in a license to use a patent in such machines, the exclusion of evidence as to what machines were known in the sewing machine trade as drop-feed machines after the date of the license, furnishes no ground of exception.

The defendants, owners of patents, agreed with the plaintiffs not to grant licenses to use the patents in drop-feed sewing machines, but afterwards granted licenses to use the patents in sewing machines, known as D. machines, which the plaintiffs contended were drop-feed machines. In an action founded on the alleged breach of the agreement by the defendants, the defendants proposed to ask witnesses when, if ever, they first heard or knew of the term drop-feed being applied to the D. machine. *Held,* that the question ought not to be put.

The fact that letters patent were issued in Great Britain in 1866 for an improvement in sewing machines by a certain designation, is not in itself evidence that the invention or its designation was known in the sewing machine trade in this country in 1868.

The defendants, owning certain patents, licensed the plaintiffs to use them in the form in which they were embodied in three specimen sewing machines, and not otherwise, except that one of said machines might be made with a drop-feed, and agreed to grant no other license for a drop-feed machine. In an action founded on the breach of the agreement by the defendants granting a license to use said patents in a machine which the plaintiffs contended was a drop-feed machine, the judge instructed the jury that the meaning of the agreement was to be determined by what kind of feed was known as a drop-feed at and before the time of the license, but that they were not to be restricted to the particular form in which it had been applied at that date. *Held,* that the defendants had no ground of exception.

At the trial of an issue whether a certain sewing machine was a drop-feed sewing machine within the meaning of a license to use certain patents in drop-feed sewing machines, it is no ground for exception that the judge refuses to instruct the jury that if the mechanical devices or the arrangement of two machines are not the same, and if the change in the device and arrangement required invention, the machines are substantially different.

CONTRACT by a corporation established under the laws of this Commonwealth against the Grover & Baker Sewing Machine Company, a corporation also established under the laws of this Commonwealth, the Wheeler & Wilson Manufacturing Company, a corporation established in Connecticut under the laws of that state, and the Singer Manufacturing Company, a corporation established in New York, under the laws of that state, to recover

the amount of fees for the use of patents which the plaintiffs had paid to the defendants in ignorance or under a mistake of facts, and which had been wrongfully taken by the defendants.

The Wheeler & Wilson Manufacturing Company and the Singer Manufacturing Company filed petitions to this court for the removal of the case to the Circuit Court of the United States for the District of Massachusetts, under the U. S. St. of 1867, *c.* 196, but *Ames*, J., refused to grant the petitions.

At the trial, before *Ames*, J., it appeared that the plaintiffs were manufacturers of drop-feed shuttle sewing machines using two threads, known as the Florence sewing machines; that the defendants, being the owners, either jointly or severally, of the legal title of several letters patent of the United States for inventions of improvements in sewing machines, entered into a written agreement with the plaintiffs, dated February 20, 1868, by which they licensed the plaintiffs to manufacture, use and vend for use the inventions contained and described in said letters patent, " so far as the same or any of them are contained in the specimen sewing machines this day deposited with the receiver of the licensors and marked ' Florence machine,' ' McCauley machine,' and ' Jencks's machine,' and in the form in which said inventions are embodied in said specimen machines, and not otherwise, except said McCauley machines may also be made with a drop-feed," for a patent rent to be paid by the plaintiffs of five dollars for every machine made or sold for use in the United States, and two dollars for every machine actually exported for use in foreign countries, and not returned to the United States; and that the other provisions of said agreement, so far as they were material to this case, were as follows :

" Fifth. Said licensees hereby agree to render to said licensors, or to such persons as they shall appoint to receive the same, quarter-yearly, from January 1, 1868, a true and full account in writing of all sewing machines made or sold by said licensees during each quarter successively while this license continues; said returns to contain the number of machines made or sold, date of sale, and to be verified by the oath of said licensees, or the em ployee having the best means of knowing the truth thereof; and

on or before the tenth day of July, October, January and April of each successive year, said licensees agree to pay said licensors or their duly authorized receiver the said patent rent for each and every machine which shall have been made or sold by said licensees during the last preceding quarter-year, and which shall not have been before paid for.

" Seventh. No other license for a drop-feed shuttle sewing machine, using two threads, is to be granted by said licensors under the before mentioned patents at a less patent rent per machine, without a corresponding reduction in the patent rent herein reserved ; and machines of the same pattern are not to be licensed to different parties.

" Tenth. It is agreed that said licensors reserve the right, at their option, to terminate this license upon thirty days' written notice thereof for breach of any of the agreements herein contained on the part of said licensees, or in case the number of sewing machines which shall be made and paid for in any quarter-year as aforesaid shall fall below two hundred and fifty ; otherwise it shall remain in force until the twelfth day of November 1871, and as much longer as the licensees elect to continue the same.

" Twelfth. It is agreed and understood that George Gifford, Esquire, is the authorized receiver of said licensors, until further appointment by them, to receive all reports and accounts of machines at any time made or sold under this agreement by said licensees, and to receive and retain all machines required by this agreement to be deposited with said licensors, and to collect and receive all sums which by this agreement are to be paid for patent rent or otherwise ; and said licensees shall render such accounts, make such deposit of machines, and make such payments to said Gifford or such other person as said licensors may appoint ; and rendering such accounts and making such payments to and deposit with said Gifford, or such other person as said licensors shall appoint, shall (so far as respects depositing machines, rendering accounts and making payments) be a compliance with and performance of this agreement by said licensees."

It further appeared that on October 1, 1868, the defendants made a written agreement with the Davis Sewing Machine Company by which they licensed that company to manufacture, use and vend for use certain of said patents in shuttle sewing machines using two threads, known as the " Davis sewing machines," not exceeding 50,000 in number, in consideration of a payment of $20,000 ; that the plaintiffs paid to the receiver named in the agreement with the defendants the full patent fees provided for in the agreement, until and including October 1, 1869 ; and that in November 1869 they first learned the terms of the agreement with the Davis Sewing Machine Company.

The plaintiffs contended that the Davis sewing machine was a drop-feed machine within the meaning of the defendants' agreement with them, and that the effect of the license to the Davis Sewing Machine Company was to reduce the plaintiffs' license fee to forty cents a machine, from and after October 1, 1868. There was much conflict of testimony on the question whether the Davis sewing machine was a drop-feed machine within the meaning of the plaintiffs' agreement.

It appeared that the money paid to the receiver was immediately after its receipt paid to the defendant companies in equal shares, and the defendants offered evidence to show that by agreement between themselves all license fees paid by the plaintiffs were to be divided between them in equal shares, and they requested the judge to rule that the plaintiffs could not maintain this action, but only several actions against each of the defendant companies for the amount each had received, but the judge excluded the evidence, and refused to rule as requested.

It also appeared that the agreement with the Davis Sewing Machine Company was cancelled by consent of the parties on December 1, 1869, and the defendants offered evidence to show that when this agreement was cancelled not more than 3500 Davis sewing machines had been made, but the judge excluded the evidence.

The defendants offered evidence tending to show what description of sewing machines were known and designated in the sewing machine trade and business as drop-feed machines subse-

quently to February 1868, and down to and including October 1868, and that the Davis sewing machine did not come within that description. The judge excluded this evidence, but allowed the defendants to introduce evidence as to what was known and designated in the trade as a drop-feed, preceding and about February 1868.

The defendants called as witnesses a large number of persons who had been engaged in the manufacture, sale and use of drop-feed sewing machines for a long time prior to February 1868, and also subsequently thereto, and put to them this question: " When, if ever, for the first time, did you hear or know of the term drop-feed being applied to the Davis sewing machine ? " The plaintiffs objected, and the judge ruled that the question should not be answered.

The defendants contended that in February 1868, the term drop-feed was applied exclusively to a certain form of feeding mechanism in which the feeding bar rose up from underneath the table against the lower surface of the material, and after moving or feeding it the required distance, receded from the material, as distinguished from the feeding mechanism which was applied from the top of the table to the upper surface of the material; that these latter were known as a distinct class of feeds by the name of top-feeds ; and that the Davis sewing machine belonged to the class of top-feed machines ; and as bearing upon this, they offered letters patent of Great Britain granted to George B. Woodruff in 1866, for a certain improvement in the feeding mechanism of " top-feeding sewing machines ; " but they were excluded. No evidence was offered that the invention in that patent, or its designation, was known in the trade in this country in 1868.

The plaintiffs contended and introduced evidence tending to show that the terms drop-feed and four motion feed, as known by the trade in 1868, were synonymous; that the term four motion feed meant the feeding device shown in one of the patents covered by the agreement with the plaintiffs, known as the Fitzgerald patent; and that the Davis sewing machine embodied substantially that feeding device.

The defendants contended and introduced evidence tending to show that the term "drop-feed" was applied exclusively to that form of the four motion feed, which is applied underneath the table as shown in the machine known as the Wheeler & Wilson machine, and also that the Davis sewing machine was neither a drop-feed nor a four motion feed machine in any sense in which those terms had ever been understood or applied; but that it was substantially a needle-feed machine, or if not a needle-feed machine, that it was a new form of feed mechanism combining the main features of the needle-feed mechanism, and only incidentally, if at all, some of the features of the drop-feed, as described in the Fitzgerald patent, and that the practical feeding was done by the needle and while it was thrust through the material to be fed.

The defendants requested the judge to instruct the jury,

"1. That the plaintiffs cannot recover unless the jury are satisfied upon the evidence that the Davis sewing machine is a drop-feed shuttle sewing machine.

"2. That if the term drop-feed had acquired a fixed and definite meaning in the sewing machine trade and business at the time the license to the plaintiffs was granted, the law conclusively presumes that that term was used in their license in that sense; and unless the feeding mechanism in the Davis sewing machine is such as was known and understood in the trade as a drop-feed, the plaintiffs cannot recover.

"3. That in order that one machine shall be substantially the same as another, the one must either employ identically the same mechanical devices as the other, and in substantially the same combination; or, if it employs different devices, the substituted devices must be well known equivalents for the other, and such as would be suggested to a mechanic having ordinary skill in that art without the exercise of any invention. But if one machine is not in the same form, or does not employ the same devices in the same combination and arrangement as the other, and if the new arrangement required invention to make it, then the one machine is not in contemplation of law substantially the same as the other but is substantially different.

" 4. That one machine is not substantially the same as another, if the arrangement of parts in one is actually different from that in another, and it requires invention to make the new arrangement.

" 5. That one mechanism is not substantially the same as another, merely for the reason that it employs one or more parts contained in a prior machine, nor because it thereby infringes upon such prior machine; and that the true question in the case is not whether the Davis sewing machine infringes the Fitzgerald patent, but whether the Davis machine is substantially such a feeding mechanism as was known in February 1868 as a drop-feed.

" 6. That if the feeding mechanism in the Davis sewing machine is applied and operates upon the top of the machine, and if in all prior drop-feed machines the feeding mechanism was applied and operated from beneath the table of the sewing machine, and if it required invention to make this change in what had been previously employed in drop-feed machines, the Davis sewing machine is not substantially a drop-feed machine within the meaning of the license to the plaintiffs.

" 7. That if in all drop-feed machines, as they existed prior to the license to the Davis Sewing Machine Company, it was essential that the needle should be out of the material when it was fed, and if it is essential to the operation of feeding in the Davis sewing machine that the needle shall be in the material when it is fed, and if it required invention to make this change, then the Davis sewing machine is not substantially a drop-feed machine."

The other prayers for instructions it is not now necessary to state.

The judge instructed the jury that if the Davis sewing machine was a drop-feed machine, the plaintiffs would be entitled to recover of the defendants in this action the full amount of the several payments made by them to the receiver, as license fees, over and above the forty cents per machine, with interest thereon from the date of the payment, without any demand; and also instructed them " that whether or not the feed in the Davis sewing machine was a drop-feed within the meaning of the license

to the plaintiffs, was a question of fact for the jury to be decided upon the evidence, and the meaning of the contract was to be determined by what kind of feed was known as a drop-feed at and before the date of the license, but that they were not to be restricted to the particular form in which it had been applied at that date."

The jury returned into court after an absence of several hours, and reported, through their foreman, that they had agreed upon a verdict. Without receiving their verdict, the judge gave them further instructions, which it is not necessary to state, and requested them to return an answer to the following question: "Was it the understanding of the trade in February 1868 that drop-feed meant exclusively the form and mode of feed used in the plaintiffs' sewing machines, as distinguished from the form and mode afterwards used in the Davis sewing machine?" Thereupon the jury again retired without delivering their verdict.

After further consultation the jury came into court and asked for instruction upon the question whether if previous to February 1868 the drop-feed had been uniformly applied in one way, namely, underneath the table as in the Wheeler & Wilson sewing machine, that fact would be decisive upon the question what, by the usage of that time, was understood as a drop-feed. The judge instructed them that such fact would not be necessarily decisive as to what by the usage was then meant by a drop-feed.

The jury returned a verdict for the plaintiffs for the amount and interest claimed.

"To all which rulings, refusals and instructions," the defendants alleged exceptions.

*J. G. Abbott & E. Merwin*, for the defendants.

*E. R. Hoar & A. L. Soule*, for the plaintiffs.

CHAPMAN, C. J. 1. The plaintiffs and one of the defendant corporations are of this Commonwealth, but the Wheeler & Wilson Manufacturing Company is a Connecticut corporation, and the Singer Manufacturing Company a New York corporation. The two last mentioned corporations petitioned for the removal of the case to the Circuit Court of the United States, but the petition was denied. It is settled that corporations are to be re-

garded as citizens in respect to the right of removal. *Railway Co.* v. *Whitton*, 13 Wall. 270. The rights of the defendants are therefore the same as if they were natural persons. But as one of them is a citizen of Massachusetts, the question arises whether the other two had a right to remove the cause under the U. S. St. of 1867, *c.* 196. The causes that may be removed under that statute are those wherein " there is controversy between a citizen of the state in which the suit is brought and a citizen of another state."

The judiciary act of 1789, *c.* 20, § 12, which provided for removal " if a suit be commenced in any state court against an alien, or by a citizen of the state in which the suit is brought, against a citizen of another state," has always been so construed as to make the test of citizenship apply to each party to the suit collectively, when more than one person are joined as plaintiffs or defendants.

Under this act, the right of removal is given to the defendant only, and must be exercised at the time of entering his appearance in the state court.

The act of 1866, *c.* 288, provided that if, in such a suit, a citizen of the state in which the suit is brought is joined as defendant, the other defendant, alien or citizen of another state, should nevertheless have the right of removal, provided, first, that the suit, so far as relates to him, is instituted or prosecuted for the purpose of restraining or enjoining him ; or, secondly, that " the suit is one in which there can be a final determination of the controversy, so far as it concerns him, without the presence of the other defendants as parties in the cause." In such case the suit, " as against him," may be removed into the Circuit Court ; and it is declared to be the duty of the state court to " proceed no further in the cause as against the defendant so applying for its removal ; " but such removal " shall not be deemed to prejudice or take away the right of the plaintiff to proceed at the same time with the suit in the state court as against the other defendants, if he shall desire to do so."

Under this act, the right of removal is given to defendants only ; but may be exercised at any time before the trial or final hearing of the cause.

The act of 1867, c. 196, provides for removal from state to federal courts upon affidavit of a party " that he has reason tc and does believe that, from prejudice or local influence, he will not be able to obtain justice in such state court ; " and extends the right, in such cases, to a plaintiff as well as a defendant, if a citizen of another state than that in which the suit is pending, and in which the other party resides. The act purports to be in amendment of the act of 1866, c. 288 ; and the defendants contend that it must therefore be construed to give the right of removal to any citizen of another state, although joined in the suit with a citizen of the same state. They also point to the phraseology of the act, which provides that where a suit is brought or pending " in which there is controversy between a citizen of the state in which the suit is brought and a citizen of another state," " such citizen of another state, whether he be plaintiff or defendant," may file a petition for its removal ; and contend that, by its departure from the language of the act of 1789, it indicates an intention to free this right of removal from the restricted construction put upon the former act.

But we think such a construction would make it conflict with the Constitution of the United States, and therefore must presume that such was not the intention with which the act was framed ; or if it was so, then that intention must be held to be ineffectual.

The language of the Constitution, Art. 3, § 2, is indeed that the judicial power of the United States shall extend " to controversies between citizens of different states." But as it does not extend, except in certain specified cases, to controversies between citizens of the same state, it cannot embrace controversies in which some of those who constitute the party on one side are citizens of the same state with those of the party on the other side, although citizens of another state are joined with them in the suit. *Bryant* v. *Rich*, 106 Mass. 180, 192, and cases cited. *Case* v. *Douglas*, 1 Dillon, 299. *Bixby* v. *Couse*, 8 Blatchf. C. C. 73.

The courts of the United States have no general common law jurisdiction. Their power is limited by the terms of the statute

conferring it.  Those limits are held strictly, and the jurisdiction must, in all cases, be made to appear explicitly.  *Bingham* v. *Cabot*, 3 Dall. 382.  *Montalet* v. *Murray*, 4 Cranch, 46.  *New Orleans* v. *Winter*, 1 Wheat. 91.  *Conolly* v. *Taylor*, 2 Pet. 556. In applying the statute, its general terms are made to conform to narrower limits of the judicial powers as established by the constitutional provisions.  *Mossman* v. *Higginson*, 4 Dall. 12.  *Hodgson* v. *Bowerbank*, 5 Cranch, 303.  The right of removal cannot be more extensive than the power of the Circuit Court of the United States over the suit, if brought there by original process. *Smith* v. *Rines*, 2 Sumn. 338.  It follows that the whole suit cannot be removed to the Circuit Court, because the controversy is, in part, between citizens of the same state, and that court has no power, under the Constitution, to entertain jurisdiction of such a controversy.  It cannot be removed as to the petitioning defendants, leaving the suit as against the resident defendant to be tried in the state court : first, because, under the statute of 1867, the whole suit is to be removed, and the state court is directed to " proceed no further in the suit ; " and secondly, because the cause of action is not divisible so as to enable the suit to be prosecuted separately against each in different courts ; and therefore is not within the scope of the act of 1866, *c.* 288.  The petition for removal was rightly refused.\*

2. The next question in order relates to the fact that, after an absence of several hours, the jury returned into court and reported, through their foreman, that they had agreed upon their verdict.  Thereupon the presiding justice, without receiving their verdict, gave them further instructions, and requested them to return an answer to the following question, namely, " Was it the understanding of the trade in February 1868, that drop-feed meant exclusively the form and mode of feed used in the plaintiffs' sewing machines, as distinguished from the form and mode afterwards used in the Davis sewing machines ? "  Thereupon the jury again retired to their room, without delivering their verdict.

---

\* The judgment upon this point was affirmed by the Supreme Court of the United States   *Case of the Sewing Machine Cos.* 18 Wall. 553.

It is not necessary to consider in this place what were the addi-
tional instructions given at that time.  After further consultation,
the jury came into court and asked for instruction on another
question, stated in the bill of exceptions, which was given them.
It need not be here repeated.  A verdict was afterwards returned
for the plaintiffs for the amount claimed by them, with interest.

The defendants excepted to all the rulings, refusals to rule, and
instructions given.  It does not appear that they excepted to the
fact that, after the jury reported that they had agreed, the judge
gave them a further instruction and sent them out again ; nor is
the reason of his course stated.  But it is contended in argument
that this course was irregular, and that the verdict should be set
aside for this irregularity.  This presents the question at what
stage of the trial the right of a presiding judge to give further
instructions to the jury ceases.  It cannot be contended that it
ceases when he has once instructed them and they have retired to
their room.  It may happen that one of the parties suggests to
the judge that some material point has been omitted in the
charge, or a mistake has been discovered in computation or some
other matter ; or that the jury send a request for a further in-
struction on some point, and they are called into the court room
and instructed.  This is admitted to be within the discretion of
the judge, whose object should be to give the jury proper and full
instructions, and correct all omissions and errors that may have
occurred in the course of the trial, as soon as he discovers them.
In respect to such matters, it is necessary to the proper adminis-
tration of justice that he should have a large discretion.  And it
may happen that the judge himself may find, on reflection, that
in his charge he has left some point obscure, especially if prayers
for further instructions are presented to him by counsel after his
charge has been given, and when the jury are about to retire, and
he has been obliged to consider the subject of these prayers has-
tily.  A little reflection may convince him that the matter needs
further explanation.  The propriety of his recalling the jury and
explaining the matter further is hardly open to reasonable doubt,
and we think his discretion extends to that matter.  Nor can it
be limited to that point, but should extend to the time of render-

ing their verdict. Even after that time there may be a plain and palpable error which the proper administration of justice would correct. But up to the time of rendering the verdict it is not irregular to send them to their room with such an instruction as is appropriate to the case, when nothing is pointed out that operates injuriously upon one of the parties. Nothing of the kind is pointed out here. The judge did not vary the substance of his charge, but made it a little more full and plain.

3. The defendants contend that the plaintiffs are not entitled to maintain an action against them jointly for the sum paid to Gifford, the receiver, and by him distributed among them before suit or demand ; but can only recover, if at all, in several actions, the sum received by each. The connection of Gifford with the parties appears in the twelfth clause of the license. By the fifth section, the plaintiffs, who are the licensees, agree to render to the licensors, or to such person as they shall appoint to receive the same, quarter-yearly, a true and full account, and to pay to them or their receiver the patent rent specified. By the twelfth section, Gifford is appointed their authorized receiver to receive reports, &c., " and to collect and receive all sums which by this agreement are to be paid for patent rent or otherwise," and the licensees are to render their accounts to him ; and making payments, &c., to him, is to be a compliance with and performance of the agreement by the licensees.

Thus, as between the plaintiffs and defendants, the payment to Gifford was a joint payment to all of the defendants, and if any part of the payment can be recovered back, they are jointly liable for it. The subsequent distribution of the amount among themselves does not concern the licensees, who had no right to inquire into the matter ; nor could the defendants so distribute it as to relieve either of them from liability for whatever was received as patent rent.

4. The claim of the plaintiffs to recover back the money sued for arises from the seventh clause of the license, which is as follows, namely : " No other license for a drop-feed shuttle sewing machine, using two threads, is to be granted by said licensors under the before mentioned patents at a less patent rent per ma-

chine, without a corresponding reduction in the patent rent herein reserved; and machines of the same pattern are not to be licensed to different parties." The patent rent reserved is to be five dollars for each machine. On October 1, 1868, the licensors granted to the Davis Sewing Machine Company, for the consideration of $20,000, the right to make a number of sewing machines, not exceeding 50,000, which are alleged to be like those mentioned in the seventh clause, and under this license the Davis Sewing Machine Company proceeded to manufacture such machines. The plaintiffs contend that this compensation is at the rate of forty cents per machine, and that consequently they were thereafter entitled to have their patent rent reduced to forty cents per machine. On the contrary, the defendants contend that the reduction would not be so great until the Davis Sewing Machine Company should have made the whole 50,000 machines for which their license was granted; and that the court erred in excluding proof that the license to the Davis Sewing Machine Company was cancelled when that company had made only 3500 machines, and also in ruling that if the Davis sewing machine was a drop-feed machine, the effect of the license to the Davis Sewing Machine Company was to reduce the plaintiff's license rent to forty cents per machine for all the machines they should thereafter manufacture during the existence of their own license, without regard to the number they might make.

The language of the seventh clause in the plaintiff's license is very strong. It expresses that no other license for such a machine shall be granted at a less patent rent per machine, "without a corresponding reduction in the patent rent herein reserved." This is a reference to the licenses themselves, and not to the machines that may be made under them. It is to take effect in modifying the rights of the plaintiffs, upon the granting of the new license, and entitles the plaintiffs to the corresponding reduction from that date. The reduction is to be calculated by a recurrence to the language of the new license. Its rate per machine is to be ascertained by taking $20,000 as the rent for 50,000 machines being forty cents per machine. The rule of reduction contended for by the defendants, namely, that it is to depend upon the num-

ber actually made under the license to the Davis Sewing Machine Company, would operate unreasonably ; for, while it would operate to enable the Davis Sewing Machine Company to reduce the price of its machines in the market immediately, it would postpone the operation of the reduction to the plaintiffs to an indefinite period.

The reduction of the plaintiffs' patent rent is not limited, by the fair construction of the seventh clause, to any number of machines, but extends at least through the time during which the other reduced license rent shall remain in force. It is not necessary to consider whether it extends further, and in that particular the ruling of the judge is practically immaterial. The cancellation of the license to the Davis sewing machine was immaterial, for it was not done till December 1, 1869, after the time when the plaintiffs ceased to pay the full original license fees, which they now seek to recover back in part.

5. The plaintiffs' license was dated February 20, 1868, and the license to the Davis Sewing Machine Company was dated October 1, 1868. The defendants offered evidence to show what description of sewing machines were known and designated in the sewing machine trade and business as " drop-feed " machines subsequently to February 1868, and down to and including October 1868 ; and that the Davis sewing machine did not come within that description. The court excluded this evidence, but allowed the defendants to introduce evidence as to what was known and designated in the trade as a drop-feed preceding and about February 1868. This ruling is objected to. But it is obvious that the term drop-feed, as used in the plaintiffs' license, had reference to what then existed, and could not be affected by any changes that might afterwards be introduced into the definition of the term. If the evidence offered had been received, it might mislead the jury, and at best it was immaterial. Its exclusion could not injure the defendants.

6. The defendants called a large number of persons who had been engaged in the manufacture, sale and use of drop-feed sewing machines for a long time prior to February 1868, and also subsequently thereto, and put to them this question : " When, if

ever, for the first time, did you hear or know of the term drop-feed being applied to the Davis sewing machine?" But the question was excluded.

The point to which the question related, if material, must have been whether or not the Davis sewing machine was in fact a drop-feed machine, and it had no bearing on that point. The delay to give it that name might arise from the efforts of interested parties to prevent its receiving such an appellation, or from its being too plainly a machine of that character to lead any person to discuss the matter, or from other causes not material, but could not authorize the jury to infer anything as to its real character.

7. The letters patent of Great Britain, granted to George B Woodruff in 1866, for a certain improvement in the feeding mechanism of "top-feeding" sewing machines, were offered in evidence by the defendants, but excluded. No evidence was offered that the invention in that patent, or its designation, was known in the trade in this country in 1868. The defendants contend that the patent was evidence tending to show that a distinction between "top-feed" machines and "drop-feed" machines was known and recognized in the trade in this country. But we do not think that the mere granting of a patent in Great Britain in 1866 would authorize the inference that the peculiarity of the invention had become known to the trade in this country in February 1868, in the absence of any other evidence that it had been used or known here or even elsewhere. The evidence was properly excluded.

8. The defendants contend that the instruction to the jury that, in determining what was understood as a " drop-feed " in the plaintiffs' license, " they were not to be restricted to the particular form in which it had been applied at that date," was erroneous, and tended to mislead the jury from the real issue. The language of the seventh section is " a drop-feed shuttle sewing machine, using two threads."

The defendants say that, at the date of the plaintiffs' license, a " drop-feed " machine had been confined to that particular form of feed in which the feeding instrument was applied from underneath the table, (in distinction from being applied on the top of

the table,) and which receded from underneath the bottom of the table after the feeding was done ; and so they say that the term " drop-feed " signifies a particular form or mode of application of four motion feed, and this particular form was made essential to the plaintiffs' license, and the restriction was confined by the contract itself to machines of that particular form. The license to the plaintiffs conveys rights specified in several patents, and provides that one of them, " said McCauley machine, may be made with a drop-feed." The phrase " drop-feed " is mentioned only in this place and in the seventh section.

Upon this point the first and second prayers for instructions were given. The third and fourth contain erroneous propositions ; for two machines may have a very different arrangement of their parts, while the peculiar characteristic that is the subject of a patent in one may be the same in both. In *Blanchard* v. *Beers*, 2 Blatchf. C. C. 411, 418, Mr. Justice Nelson says : " No man can appropriate the benefit of the new ideas which another has originated and put into practical use, because he may have been enabled, by superior mechanical skill, to embody them in a form different in appearance or different in reality. For although he may not have preserved the exterior appearance of the previous machine, he may have appropriated the ideas which give to it all its value." The instruction given accords with this view of the law, and was correct. The fifth prayer was substantially adopted. The sixth and seventh prayers contained erroneous propositions ; for, consistently with these propositions, each of the two machines might contain the characteristic which would make them " drop-feed " machines. It may require invention to make a change in the arrangement of a machine which is a palpable infringement of an existing machine. The remaining prayers contain argumentative propositions connected with questions of fact ; and so far as they may be construed to contain legal propositions, they were substantially covered by the instructions given to the jury No error in this respect has been pointed out to us.

*Exceptions overruled.*